Turley, J.
delivered the opinion of the court.
At the session of the Legislature of the State of Tennessee, in the year 1835-6, the Hiwassee Rail Road Company was created a body corporate, with perpetual succession, with power to sue and be sued, plead and be impleaded, and to possess and enjoy all the rights, privileges and immunities, with power to make such by-laws, ordinances, rules and regulations, not inconsistent with the laws of this State and the United States, as shall be necessary to the well ordering and conducting the affairs of said company; and be capable in law of purchasing, accepting, selling and conveying estates, real, personal and mixed, to the end, and for the purpose of facilitating the intercourse and transportation from Knoxville, East Tennessee, through the Hiwassee district, to a point on the southern boundary of Tennessee, tobe designated by commissioners as the most practicable route to intersect the contemplated rail road from Augusta to Memphis.
By the 2nd section of the act of incorporation, the capital stock of the company is limited to six hundred thousand dollars, in shares of one hundred dollars each; and it is provided, that, so soon as four thousand shares are subscribed, the corporate power of said company shall commence and have as full operation as if the whole of the shares comprising the capital stock were subscribed.
By the 4th section, it is provided, that there shall be paid on each share subscribed, but not till after four thousand shares shall have been subscribed, such sum as the president and directors, or a majority of them, may direct, and in such in-stalments, not exceeding one fourth of the subscription in any one year: Provided, no payment shall be demanded until at least thirty days notice shall have been given by the said *517 president and directors in the newspapers printed in the town of Knoxville and Athens, of the time and place of payment; and if any subscriber shall fail or neglect to pay any instalment or part of said subscription thus demanded, for thirty days next after the time it fell due, the stock on which it was demanded, together with the amount paid in, may, by. the president and directors, or a majority of them, be declared forfeited, and, after due notice, shall be sold at auction for the benefit of the company, or they may waive the forfeiture after thirty days default, and sue the stockholders, at their discretion, for the instalments due.
By the 13th sec., the president and directors of said company are invested with all the powers and rights necessary for the building, constructing, and keeping in repair of a rail road from Knoxville, East Tennessee, through the Hiwassee district, to a point on the southern boundary of Tennessee, on the nearest, best and most practicable route — the road to have as many tracks as may be deemed necessary by the board of directors, but not to be more than one hundred feet wide, which the company may purchase, or cause the same to be condemned for the use of the road, or any less breadth, at the discretion of the directors, and they may cause to be made, or contract with others for making of said road or any part thereof; and they, or their agents, or those with whom they may contract for making any part of said road, may enter upon, use and excavate any land which may be laid out for the site of said road, for the erection of warehouses, engine arbors, reservoirs, booths, stables, offices and mechanics’ shops, or other works necessary or useful in the construction and repair thereof; and may fix scales and weights, build bridges, lay rails, make embankments and excavations; may use any earth, ground, rock, timber, or other material, which may be wanted for the construction and repair of any part of said road; and may construct and acquire all necessary steam engines, cars, wagons and carriages for transportation on said road by horses or steam power, and all necessary apparatus for the same.
Sections 15 and 16 make provision for compensation and payment by the company to individuals, for land or other pro *518 perty appropriated under the provisions of the charter to the making of said road, and incidental injuries done by reason of its construction.
These are all the provisions of the charter that need be adverted to, for the purpose of investigating the questions of law arising in the case. Under the provisions of this charter, the company was legally organized and proceeded to construct the road; much work was done in excavations, embankments, building bridges, &c., and much money expended therefor,' and in the payment of the salaries of the different officers necessary for the superintendence thereof. In the construction, the company became indebted to one Kennedy Lonergin, a contractor for grading the road, in the sum of five thousand dollars; .for the payment of which, It executed, by its president, its promissory note to S. D. Jacobs, negotiable and payable at the office of discount and deposite of the Union Bank of the • State of Tennessee at Knoxville; this note was negotiated by S. D. Jacobs to John C. Trautwine, and by him to the Union Bank, and the proceeds passed by the Bank to the credit of Kennedy Lonergin. When the note fell due, it was protested for non-payment, and due notice thereof given to the endorsers, Jacobs and Trautwine. They failing to pay, suit was instituted thereon against S. D. Jacobs, the first endorser, in the circuit court of Knox county, and the same was brought to trial before a jury at the February term thereof, 1845, when the circuit Judge charged the jury, “that the note was drawn by the Hiwassee Rail Road Company, in violation of its corporate powers; that it was, therefore, null and void; and that the plaintiffs were not entitled to recover.” Under this charge, a verdict was returned in favor of the defendant, and judgment rendered thereon against the plaintiffs, to reverse which, a writ of error is prosecuted to this court.
It is contended against the plaintiffs’ right to recover, that there is no power given, either expressly or by necessary implication, by the charter to the Hiwassee Rail Road Company, to borrow money or to execute promissory notes; and that, thérefore, the note executed and endorsed to the Bank is void, *519 both as against the maker and endorsers, and that no action can be maintained against them thereon.
The construction of the powers of corporations has been a fruitful source of litigation, both in the courts of Great Britain and the United States. In the earlier cases they were construed with great strictness, and a stringent rule, as to the mode of exercising them, enforced. Mr. Story, in the case of the Bank of Columbia vs. Patterson, Adm’r, 7th Cranch 305, says: “Anciently it seems to have been held that corporations could not do any thing without deed—13th H. 8, 12; 4th H. 7, 6; 7th H. 7, 7, 9. Afterwards, the rule seems to have been relaxed, and they were for convenience sake permitted to act in ordinary matters without deed, as to retain a servant, cook, or butler—Plow. 91; 2d Saunders 395—and gradually this relaxation widened to embrace other objects—Bro. Corp. 51; 3rd Salk. 191; 3rd Lev. 107. At length, it seems to have been established, that, though they could not contract directly except under their corporate seal, yet they might, by mere vote or other corporate act, not under their corporate seal, appoint an agent whose acts and contracts within the scope of his authority would be binding on theJ corporation—3d P. Wms. 419; and courts of equity, in this respect, seeming to follow the law, have decreed a specific performance of an agreement made by a major part of a corporation, and entered in the corporation books, although not under the corporate seal—1st Fonblanques Equity 305. This technical doctrine has in more modern times been entirely broken down.” The same Judge, in continuation in the same case, observes: “The doctrine that a corporation^ could not contract except under its seal, or, in other words, * could not make a promise, if it had ever been fully settled, must have been productive of great mischief. Indeed, as soon as the doctrine was established, that its regularly appointed agents could contract in their name without seal, it was impossible to support it; for, otherwise, the party who trusted such contract would be without remedy against' the corporation. Accordingly it would seem to be a sound 1 rule of law, that whenever a corporation is acting within I the scope of the legitimate purposes of its institution, all! *520 parol contracts, made by its authorized agents, are express promises of the corporation; and all duties imposed upon them by law, and all benefits conferred at their request, raise implied promises, for the enforcement of which, an action may well lie—3rd Bro. Ch. Rep. 262; Douglass 524; 3rd Mass. Rep. 364; 5th Mass. 89, 491; 6th Mass. 50. Whatever of strictness may have existed in the earlier cases, in restricting their power of contracting to the express grant of authority, has been also greatly relaxed, and the doctrine upon the subject been made more conformable to reason and necessity, the powers granted to corporations being now construed like all other grants of power, not according to the letter, but the spirit and meaning. In Angell & Ames on corporations, page 192, sec. 12, it is said, “a corporation having been created for a specific purpose, can not only make no contracts forbidden by its charter, which is, as it were, the law of its nature, but in general can make no contract which is not necessary, either directly or incidentally, to enable it to answer that purpose. In deciding, therefore, whether a corporation, can make a particular contract, we are to consider, in the first place, whether its charter, or some statute binding upon it, forbids or permits it to make such a contract; and if the charter and valid statutory law are silent upon the subject,fin the second place, whether the power to make such a contract may not be implied on the part of the corporation, as directly or incidentally necessary to enable it to fulfil the purpose of its existence, or, whether the contract is entirely foreign to that purpose/ In general, an express au-' thority is not indispensable to confer upon a corporation the right to become drawer, endorser, or acceptor of a bill of exchange, or to become a party to any other negotiable paper. It is sufficient, if it be implied as the usual and proper means to accomplish the purposes of the charter.—Chitty on Bills, 5th Ed. 17 to 21; Baily on Bills, ch. 2, sec. 7, p. 69; (5th Ed.) Story on Bills of Exchange, sec, 79, p. 94. In the case of Mum vs. Commission, Co. 15th Johnson 52, Spencer, »J., who delivered the opinion of the court, says: “It has been strongly urged, that, under the act incorporating this company, they.could neither draw nor accept bills of exchange. *521 Their power is undoubtedly limited; they áre required to employ their stock solely in advancing money, when required, on goods and articles manufactured in the United States, and the sale of such goods and articles on commission. The acceptance of a bill is an engagement to pay money; and the company may agree to pay or advance money at a future day, and they may engage to do this by the acceptance of a bill. When a charter or act of incorporation and valid sta-, tutory law are silent as to what contracts a corporation may' make, as a general rule, it has power to make all such contracts as are necessary and usual in the course of business, as means to enable it to attain the object for which it was created, and none other. The creation of a corporation for a specific purpose, implies a power to use the necessary and usual means to effectuate that purpose.—Angell & Ames on Corp. 200, sec. 3.
Mr. Story, in his treatise on bills of exchange, p. 95, speaking of the power of corporations to draw, endorse, and accept bills of exchange, says: “it is sufficient if it be implied as a usual and appropriate means to accomplish the objects and purposes of the charter. ' But when the drawing, endorsing or accepting such bills is obviously foreign to the purposes of the charter, or repugnant thereto, then the act becomes a nullity, and not binding on the corporation.”
In the case of the People vs. the Utica In. Co., 15th Johns., Thompson, Chief J., who delivered the opinion of the court, says, at page 383, “an incorporated company has no rights but such as are specially granted, and' those that are necessary to carry into effect the powers so granted.”
In the case of Mott vs. Hicks, a quantity of wood was purchased for the president and directors of the Woodstock Glass Company, by Whitehead Hicks, the president thereof, for which he executed the promissory note of the company at six months. It appears, from a reference in argument to the charter of the company, that there was no clause authorizing it to issue bills or notes, or making such, if issued, binding and obligatory upon the company; yet it was held by the court, that an action would lie against the corporation upon the note, it having been executed by its legally authorized *522 agent, acting within the scope of the legitimate purposes' of such corporation.—1st Cowen 513.
In the case of Hayward vs. the Pilgrim Society, 21st Pick. 270, it was held that the trustees of a society incorporated for the purpose of building a monument, in virtue of their authority to manage the finances and property of the society, were held competent to bind the society by a promissory note through the agency of their treasurer.
These authorities fully establish the proposition, that, in the construction of charters of corporations, the power to contract, and the mode of contracting, is not limited to the express grant, but may be extended by implication to all necessary and proper means for the accomplishment of the purposes of the charter. Now, what are necessary and proper means? Mr. Story,- as we have seen, says, if the means are usual and appropriate, the implication of power arises.— Story on Bills, 95.
Chief Justice Marshall, in the case of McCullock vs. the State of Maryland, 4th Wheaton 413, says: “But the argument on which most reliance is placed, is drawn from the peculiar language of this clause of the constitution. Congress is not empowered by it to make all laws which may have relation to the powers conferred on the government, but such only as may be necessary and proper for carrying them into execution. The word ‘necessary’ is considered as controlling the whole sentence, and as limiting the right to pass laws for the execution of the granted powers, to such as are indispensable, and without which the power would be nugatory. That it excludes the choice of means, and leaves Congress, in each case, that only which is most direct and simple. Is it true, that this is the sense in which the word ‘necessary’ is always used? Does it always import an absolute physical necessity, so strong that one thing to which another may be termed necessary cannot exist without- that other? We think it does not. If reference be had to its use in the common affairs of the world, or in approved authors, we find that it frequently imports no more than that one thing is convenient or useful or .essential to another. To employ the means necessary to an end, is generally under *523 stood as employing any means calculated to produce the end, and not as being confined to those single means, without which the end would be entirely unattainable. Such is the character of the human mind, that no word conveys to it, in all situations, one single definite idea, and nothing is more common than to use words in a figurative sense. Almost all compositions contain words which, taken in their rigorous sense, would convey a meaning difierent from that which is obviously intended. It is essential to just construction, that many words, which import something excessive, should be understood in a more mitigated sense — in that sense which common usage justifies. The word ‘necessary’ is of this description. It has no fixed character peculiar to itself. It admits of all degrees of comparison, and is often connected with other words, which increase or diminish, the impression the mind receives of the urgency .it imports. A thing "may be necessary, very necessary, absolutely or indispensably necessary. To no mind would the same idea be conveyed by these several phases.” In conclusion upon this subject, he says, page 421, same casé: “We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended. But we think the sound construction of the constitution must allow to the National Legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all the means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.”
Now, if this be true doctrine in relation to the constitution of the United States, surely it will not be contended that a more stringent rule will be applied in the construction of the powers of a corporation, than is applied in the construction of the powers of Congress under the constitution of the United States.
To apply these principles as established by the authorities *524 cited, to the case under consideration. The Hiwassee Rail Road Company is chartered to construct a rail road, a thing! of itself necessarily involving a heavy expenditure of money; but in addition thereto, it is empowered to sue and be sued, to acquire and hold, sell, lease and convey estates real, personal and mixed, which necessarily involves the power of making contracts for the same. How shall these contracts be made, both for the construction of the road and the purchase of the property? It is argued, that the capital stock of the company is the only means provided for the payment, and that no other can be resorted to for that purpose; or, in other words, that it must pay cash for every contract, for that no power is given by which it may contract upon time; for if it may create a debt, of necessary consequence, it may create written evidences of that debt, and these may be either promissory notes or bills of exchange. It is true, that the capital stock of the company is the source from whence an ultimate payment of the debts of the company must be made, but to hold that a sufficient amount of this stock must always be on hand, to pay immediately for every contract made, would be destructive of the operations of the company. By the provisions of the charter, not more than one fourth of the stock shall be called for in any one year, and this upon thirty days notice; and if, within thirty days after such notice, the amount called for be not paid, the company is authorized to take steps against the delinquent stockholders, to enforce payment. Now, it is obvious that it never was intended that all the stock should be paid in before the company commenced operations. The early completion of the road was a desirable object for commercial purposes, and can it be pretended, that the expenditures of the company were to be limited and restricted to the amount of capital actually paid in by the stockholders, and that under no circumstances were the company to exceed them. If, upon a failure of the means on hand, the stockholders should neglect to pay upon a proper call, are the works to be suspended until such time as payments could be enforced? Are the persons who may have done work for it, and for which they have not been paid, to wait the slow process of the law before they can receive satisfac *525 tion? And shall the company not be permitted to use its credit in such emergency? It is so argued for the defendant. This construction of the charter would be ruinous in its consequences. The company might be compelled to suspend all operations at a time when great loss would result from deterioration to unfinished work, and be greatly injured also in its credit.
The restriction contended for is too refined and technical. It might have suited the days of the Year Books, when it was held that a corporation could contract for nothing except under its corporal e seal; but it is strange that it should be urged at this day of enlightened jurisprudence, when the substance of things is looked to rather than forms. A corporation is, ini the estimation of law, a body created for special purposes, and! there is no good reason why it should not, in the execution of these purposes, resort to any means that would be necessary} and proper for an individual in executing the same, unless in be prohibited by the terms of its charter, or some public lawj from so doing.
There is no principle which prevents a corporation -frena» contracting debts within the scope of its action; and, as has been observed, if it may contract a debt, it necessarily may make provision for its payment, by drawing, or endorsing, or accepting notes or bills. It is not pretended that this power extends to the drawing, endorsing or accepting bills or notes generally, and disconnected from the purposes for which the corporation was created.
The corporation, in the present case, was indebted to one of its contractors for work done upon the road, for the payment of which, the note in question was drawn. This, upon i principle and authority, was a usual and appropriate means \ for accomplishing the object and purposes of the charter, viz:! the construction of the road. Not only do all the elementary writers sustain this view of the subject, but, as we have seen, there are three adjudicated cases in courts of high authority directly in its favor. The case of Mum vs. Commission Company, 16th John. 52; the case of Mott vs. Hicks, 1st Cowen 513; and the case of Hayward vs. the Pilgrim Society, 21st Pickering 270.
*526 There has not been produced a single case to the contrary. The cases cited relied upon are decided upon different grounds entirely. The case of Broughton, and others vs. the Company and Proprietors of the Manchester and Salford Water Works, 3d Barnwell & Alderson 1, reported in the English Common Law Reports 215, decides nothing more than that a corporation, not established for trading purposes, cannot be acceptors of a bill of exchange, payable at a less period than six months from the date, because such a case falls within the provisions of the several acts passed for the protection of the Bank of England, by which it is enacted, that it shall not be lawful for any body corporate to borrow, owe, of take fup any money upon their bills or notes payable at demand, or at any less time than six months from the borrowing thereof. It is true, that Baily, J., in his opinion, says: “There being no power expressly given to the corporation to make promissory notes or become parties to bills of exchange, I should doubt very much (even if the Rank acts were entirely out of the question) whether such corporation would have any power to bind itself for purposes foreign to those for which it was originally established; and Best, J., in his opinion, says: “I am also of opinion, that this action is not maintainable, because, this case comes within that rule of law by which corporations are prevented from binding themselves by contract not under seal. When a company, like the Bank of England, or East India Company, are incorporated for the purposes of trade, it seems to result from the very object of their being so incorporated, that they should have power to accept bills or issue promissory notes; it would be impossible for either of these companies to go on without accepting bills. In the case of Stark vs. the Highgate Arch Way Company, 5th Taunt. 792, the court of common pleas seemed to think, that, unless express authority was given by the act establishing the company to make promissory notes eo rfomine, a corporation could not bind itself except by deed. Now, there is nothing in the act of Parliament establishing this company, which authorizes them to bind themselves except by deed.” So, the authority of this case for the defendant, rests solely upon the dubitatur of Baily and the opinion of *527 Best, that the company could only bind itself by deed. How much, under these circumstances, it is worth, need not be said.
The case of the People of the State of New York vs. the Utica Insurance Company, 15th Johnson 358, decides, “that, since the act to restrain unincorporated banking associations, (April 11th, 1804, re-enacted April 6th, 1813,) the right or privilege of carrying on banking operations by an association or company, is a franchise which can only be exercised under a legislative grant; that a corporation has no other powers than such as are specifically granted by the act of incorporation, or are necessary for the purposes of carrying into effect the powers expressly granted; and that the act to incorporate the Utica Insurance Company does not authorize the company to institute a bank, issue bills, discount notes, and receive deposites. Such powers not being expressly granted by the Legislature, and not being within their intention, as collected from the act of incorporation, and that the company having assumed and exercised these powers, they were held to have usurped a franchise.
It is scarcely necessary to enter into an investigation, to show the ground upon which this decision rests. Banking privileges, by an association or company, in New York, rest upon express grant. There was no such grant to the Utica Insurance Company, and an exercise of the power was not necessary and proper to the performance of the purposes for which it is created, but wholly foreign thereto.
In the case of the New York Firemen Insurance Company vs. Ely, 2d Cowen 678, it is held, that a company incorporated for the purpose of insurance, and forbidden to carry on any other trade or business, also forbidden to exercise banking powers, with a clause in the act incorporating them, enumerating the kind of securities upon which they may loan money, but not including promissory notes in such enumeration, have no power to loan moneys upon promissory notes or any securities other than those especially enumerated. This company being incorporated for the purpose of insurance only, the discounting of promissory notes would have been foreign to the purpose of its creation; but, in addition there *528 to, it is expressly prohibited from carrying on any other trade or business, or exercising banking powers, and the kind of securities upon which it may loan money are especially enumerated, promissory notes being excluded, it is a well settled maxim of the law, the expressio unius exclusio est alterius;— then, tor many reasons, this company had no power under its charter to discount notes. It is not only not given expressly or by implication, but upon every principle of legal construction, is withheld.
In the case of the Life and Fire Insurance Company vs. *529 the Mechanics Fire Insurance Company, of New York, 7th Wendell 31, it is held, that “a corporation authorized to lend money only on bond and mortgage, cannot recover money lent by the corporation, except a bond and mortgage’be taken for its re-payment; every other security, as well as the contract itself, is void, and not the basis of action. The reason for this decision is obvious; bond and mortgage being speci *530 fied as the securities, upon which the company might lend money, all others were considered as excluded, upon the principle mentioned above, expressio unius exclusio est alterius.
These are all the cases relied upon by the defendant for the support of the position assumed by him; we are satisfied that they have no applicability to the question, and are not authority in this case.
*528 NOTE.
[On the questions involved in this case, Chancellor Kent was consulted, and gave the following opinion. It is deemed worthy of preservation, and is therefore published. — Refou/ter.]
CASE AND OPINION.
S. D. Jacobs, Esq., of Knoxville, in Tennessee, has heen sued as endorser on notes given by the Hiwassee Kail Road Company to certain Banks in the State of Tennessee, for moneys borrowed by and on behalf of the company for their use; and the following questions have been submitted to me for my opinion as answering in that case:
1st. Has the Hiwassee Rail Road Company any power under their charter to borrow money?
2d. If not, are the notes of the company (being what are called accommodation notes) illegal and void, not only against the company but as against the endorséis?
3d. Have the company competent power to execute a deed of trust, by way of assignment of the effects of the company in trust, to pay their bank and other liabilities, and to give, by such assignment, precedence to debts due to the banks?
The charter of the Hiwassee Rail Road Company, and also the very able opinion of George S. Yerger, have been examined by me in aid of my examination of. the questions stated.
1st Question. — In answer to the first question, I am of opinion that the Hi-wassee Rail Road Company had no power under their charter to borrow moneys from a Bank and give their notes therefor, in aid of the business of making and constructing the road.
Let us first see what were the powers and duties of the president and directors of the company under their charter; for we may lay it down as a settled and incontrovertible principle, that a private corporation created by statut_e_far_3-ape-cific object, has no powers but such as are specially granted,, and is confined in the exercise or application of these powers, to the mode or manner prescribed in the charter.
By the 1st section, the associates are made a body corporate, with perpetual succession, and to sue and to be sued, and to possess “all the rights, privileges and *529 immunities as should be necessary to the well ordering and conducting the affairs of the company;” they are likewise declared to be capable, in law, “of purchasing, accepting, selling, leasing and conveying estates, to the end and for the purpose of facilitating intercourse,” &c.
By the 2d section, the capital stock was declared to be $600,000, and the corporate powers were to commence when $400,000 were subscribed.
By the 4th section, after 4,000 shares shall have been subscribed, there was to be paid on each share such sum as the company might direct, and in such install ment, not exceeding one forth of the subscriptions in any one year; the instal-ments, if not paid, may be sued for, or the stock forfeited, on discretion.
By the 12th section, if-the capital stock of the company be found insufficient for the purposes of the road, the company may enlarge it, from time to time, so as not to exceed in the whole $1,500,000, and new subscriptions for that purpose to be opened.
'By the"l3th section, the company are invested with all the powers and rights necessary for the building," constructing and keeping in repair the road, &c.; that “they may cause to be made or contract with others for making the road, and they or their agents, or those with whom they may contract for making the road, may enter upon lands laid out for the road, and use the same for the erection of houses, reservoirs, &c., and build bridges, lay rails, make embankments and excavations, &c., and use the earth, rock, timber, &e., wanted for the road, &c., and construct and acquire the necessary steam engines, cars, &c., and all necessary apparatus, &c.
By the 18th section, the company may acquire and own lands connected with the road, to erect warehouses, stables, &e.
By the 19th section, the whole stock and property of the company is to be deemed personal property.
/ Here we have the delineation of the powers of the company, and it cannot but strike any attentive reader of the act, that those powers are very specially designated and confined within strict and narrow limits. The road is to be made out of capital or funds raised by subscriptions, and to be called for from time to time, under reasonable and guarded checks, from the subscribers or stockholders. The power of acquiring and making the road, the extent of the expenditures to be bestowed in making it, the source from which the moneys requisite for the work are to be procured, and the manner in which they are to be raised, are all declared in the charter with a certainty and precision that cannot be mistaken; and here we may confidently conclude that the charter contains no power in the president and directors to borrow money upon loan, or to give their promissory notes to *530 the lender of money, for the purpose of making the road and carrying into effect the object of the charter. The mode of raising the funds, and the limitation to the amount of those funds, are specifically prescribed, and all the other modes are necessarily excluded.
That it is an established and deemed a salutary rule in the construction of corporate powers, where the charter is for special purposes, and the powers and the manner of executing them specially designated, that no other powers and no other mode of exercising the powers granted, can be deemed lawfully to exist, I would refer to the English and American cases. •' • • ■' /
They are principally cited in the argument of Mr. Yerger, to which I have alluded, and I need only state the authorities generally. I refer to the English cases of Broughton vs. Manchester Water Works Company, 3 Barn. & Ald. 1; Dublin Corporation vs. Attorney General, 9 Bligh. M. S. 395; Stark vs. Highgate Archway Co., 5 Taunton 792; and Parrot vs. Eyre, cited by Mr. Yerger from the Jurist, (and which case I have not seen,) in support of the general principle.
But the American cases are far more numerous, instructive and decided, and I think they are entitled to be considered as commanding authorities and as settling this point in our American jurisprudence.
In the Supreme Court of the United States, we have the decisions of Head & Armory vs. Providence Insurance Co., 2 Cranch 167; Marshall, Ch. J., in Dartmouth College vs. Woodward, 4 Wheaton 686; Story, J., in the case of the Bank of the United States vs. Dandridge, 12 Wheaton 68; McLean, J., in Beaty vs. Lessee of Knowles, 4 Peters 160; Taney, Ch. J., in the case of the Bank of Augusta vs. Earle, 13 Peters 587; Runyan vs. Carter, 14 Peters 122.
In the State courts we have the decision of Thompson, J., in the case of the People vs. Utica Insurance Co., 15 Johnson 383; of Woodworth, J., in the case of the New York Fireman Insurance Co. vs. Sturges, 2 Cowen 675; Savage, Ch. J., in the case of the New York Fireman Insurance Co. vs. Ely, 2 Cowen 709; North River Insurance Company vs. Lawrence, 3 Wendell 482; the Life and Fire Insurance Co. vs. Mechanics Fire Insurance Co., 7 Wendell 31; the New York Firemen Insurance Co. vs. Ely, 5 Con. R. 560; and the State vs. Stebbins, 1 Stewart’s Alabama R. 299.
All the cases recited recognize the general doctrine, but some of them are more emphatically applicable than others. Thus, in the case from 3 Wend. the charter authorized the company to make loans of its funds on bond and mortgage, and it was held that this was an implied prohibition to loan money on the hypothecation of stock, or on a note or any other security than the one specially prescribed; for *531 when a specific mode of doing an act was prescribed to a corporation, it necessarily excluded all other modes, and rendered them unlawful and void. So, in the Connecticut case it was declared that when the power of loaning money on the discount of notes was not expressly granted to a corporation, nor necessary to carry into effect powers granted, it was impliedly prohibited and that a grant of specific powers excluded, by implication, the grant of other powers.-
We are then of opinion, (to use the words of Chief Justice Marshall, in the case of McCulloch vs. the State of Maryland,) that the end proposed by the Hiwassee Rail Road Com-1 pany, in executing ihe note in question, was legitimate, within the scope of its charter; that as a means it was appropriate, and plainly adapted to that end, which is not pro *532 hibited, but consistent with the letter and spirit of the charter, and therefore not void, but binding and effectual upon the company and the endorsers.
*531 But I need not enlarge on this point. The settled doctrine of corporate law is too clear to be mistaken and too solidly sustained to be disturbed; nor need I have said any thing more than to declare my entire acquiescence in the opinion of Mr. Yerger, for he may be said to have nearly exhausted the question.
2d Question. — Are the notes of the company void against the companj and their endorsers?
My answer is, that the notes being illegal and impliedly prohibited, they cannot be enforced against any of the parties thereto. The received rule of law is, according to the observation of Lord Ellenborough, and of the court in Lanylon vs Hughes, 1 Maule & Selwyn 593, that what is done contrary to law cannot be made the subject matter of an action. None of the parties to the note, drawers^ or payees, can be held responsible upon it, for the contract is illegal and void.
This is the decided and authoritative language of the cases, as see Bank of the United States vs. Owens, 2 Peters Rep. 527, 540; Nashville Bank vs. Hays and Grundy, 1 Yerg. Rep. 243; 2 Id. 255, case of Tilford vs. Sumner. In all the cases cited, the endorsers were sued, and where the notes are held to be illegal and void, none of the parties thereto are held to be bound.
When a note is declared to be illegal, prohibited, and void, the other conclusion follows as a necessary consequence — there is no ground for the claim to rest upon.
The cases which held that an endorser is liable to his endorsee, though the note be forged, stand on a different principle. The endorser admits the note to be genuine and makes a new contract with his innocent endorsee, and he cannot gainsay his own act; but he does not and cannot admit the note to be legal, for this would contravene the law.
On the other hand, he may show, and the court is bound to know, that the contract is prohibited by law and cannot be enforced, any admission to the contrary that might otherwise be inferred from the endorsement. The prohibitions of law would be rendered vain and nugatory upon any other doctrine.
The cases referred to, as well as the reason of the thing, settle this point beyond dispute.
3d Question. — It is a very clear point that a corporation, as well as a private individual, being in failing circumstances, and unable to meet its engagements, may make an assignment of its property, in trust, to be applied to the payment *532 of its debts, and that, in the assignment, it may make preferences and prefer one debt and one creditor to another.
Let the judgment of the circuit ^pojirt be reversed, and the case be remanded for a new trial. . ’
This principle of law and equity is well declared in the following cases, and which leave no doubt to cast a shadow on the question. I refer to the Union Bank of Tennessee vs. Ellicot; and the State of Maryland vs. the Bank of Maryland, C. Gill & Johnson 363, 205; Revere vs. Boston Copper Company, 15 Pick. R. 351; Catlin vs. Bank of New Haven, C. Conn. R. 233.
Though the notes, in the case before me, were illegal and void, yet the loans were made bopa fide, and in justice and equity the moneys borrowed ought to be refunded. There is no doubt of that; and the Rail Road Company have acted justly and honorably in making provision in the trust deed for the repayment of those loans and giving those loans the preference. This trust ought to be faithfully executed by the trustees, and a court of equity never will interfere and disturb that trust, except upon a condition that the trustees shall do equity by paying the Bank loans. The Rail Road Company cannot revoke their assignment, honestly made, and upon a valuable consideration. It was a voluntary act, and the company are bound by it, at least so far as to enable its provisions to be executed. If the Banks, or any of them, will not accept of the trust, it will become so far nugatory; but if they do accept, (and it is not necessary that they should be parties in the first instance, any subsequent assent is sufficient,) the assignment vests the assets of the company, in the trustees retrospectively from its date, and that vested interest cannot be displaced but upon the condition which I have mentioned; and having once accepted of the trust, a court of equity will compel them to execute. It becomes a new engagement and obligatory in equity.
The opinion of Mr. Yerger was so full and clear, that it might have been sufficient for me at once to have subscribed to it, and not have gone into an examination of the case in detail. But I presumed it would be more satisfactory to the gentlemen who consulted me, that I should, as I have done, examine the case for myself and make myself certain of their application and pertinency, and of the conclusive force of the reasoning by which they can be supported.
New Yonk, Oct. 1842. JAMES KENT.
I have been requested to reconsider the preceding opinion, and I have accordingly revised it and looked again at the material anthorities. I see no reason whatever to question or vary any of the conclusions to which I had arrived in answer to the points stated. It appears to me that the opinion is on every point sound and correct, and well supported by authority. There are no new cases that I have met with material to the discussion, and I might submit the opinion as it stands with my judgment in its favor.
New York, April, 1844. JAMES KENT.